The **NATIONAL ASSOCIATION OF MO-TOR BUS OWNERS, Plaintiff,**

v.

The **UNITED STATES of America, Defendant,**

**Interstate Commerce Commission, Intervenor Defendant,**

**Ralph Nader and Action on Smoking & Health, Intervenor Defendants.**

**Civ. A. No. 662-72.**

United States District Court, District of Columbia.

Jan. 31, 1974.

Robert J. Corber, Washington, D. C., for The Nat. Ass'n. of Motor Bus Owners.

Walker B. Comegys, Acting Asst. Atty. Gen., Harold H. Titus, U. S. Atty., John H. D. Wigger, Dept. of Justice, for the U. S.

Fritz R. Kahn, Gen. Counsel, and Seymour Glanzer, I. C. C., for I. C. C.

William L. Slover, Washington, D. C., for Ralph Nader.

John F. Banzhaf, III, Peter H. Meyers, Washington, D. C., for Action on Smoking and Health.

Before ROBB, Circuit Judge, and SMITH and PARKER, District Judges.

## OPINION

PARKER, District Judge.

Plaintiff, a national trade association for the intercity motor bus industry,[1] brought this action against the United States[2] to enjoin the enforcement of orders of the Interstate Commerce Commission ("Commission") promulgating a regulation which restricts smoking on buses traveling in interstate commerce.[3] The Commission, Ralph Nader, and Action on Smoking and Health were granted leave to intervene as defendants.[4] This Three-Judge Court was convened[5] and considered argument on the jurisdictional, procedural and substantive challenges to the regulation. Plaintiff contends that the regulation effects a change of existing certificates of public convenience and necessity in violation of § 212 of the Interstate Commerce Act, 49 U.S.C. § 312, that the Commission had no jurisdiction to promulgate the regulation, and that the regulation is arbitrary and based on findings which are inadequate and unsupported by the administrative record. For the reasons which follow, we find these challenges to be without merit and, accordingly, we deny plaintiff's application.

## I. Proceedings Before the Interstate Commerce Commission

On January 8, 1970, Ralph Nader filed a petition with the Commission requesting a rulemaking proceeding to establish a regulation prohibiting the smoking of cigars, cigarettes, and pipes on passenger motor carriers in interstate commerce. A rulemaking proceeding was instituted and an evidentiary hearing was held before an examiner at which Ralph Nader and plaintiff were the only participants.

The hearing examiner issued a report in which he found that petitioner Nader did not satisfy the burden of proving that exposure to second-hand smoke represents a hazard to the health of passengers, that it prevents carriers from providing safe, continuous, or adequate service, or that it improperly impinges on the requirements of the public convenience or necessity.[6] However, the examiner did conclude that second-hand smoke had the capability of disturbing many passengers to some degree, especially persons with respiratory ailments, and recommended that affected riders be afforded reasonable protection from excessive exposure to tobacco fumes.[7] He proposed that a regulation be prescribed requiring carriers to post signs on all buses which read: "Please do not smoke

---

1. Plaintiff, the National Association of Motor Bus Owners, will also be referred to as "NAMBO."

2. An action to enjoin an order of the Interstate Commerce Commission is required to be brought against the United States. 28 U.S.C. §§ 2321, 2322 (1970) (All sections of the United States Code hereinafter cited refer to the 1970 edition).

3. Two orders are at issue. The first, dated November 8, 1971, promulgates a regulation which limits smoking on interstate passenger carrier vehicles through provision for separate seating for smokers and nonsmokers and the restriction of the number of seats in the smoking section to 20 per cent of the capacity of the vehicle. That regulation appears at page 3 *infra*. The second order, dated March 8, 1972, denied NAMBO's petition for reconsideration.

4. Ralph Nader was the petitioner in the rulemaking proceeding before the Commission. Interstate Commerce Commission Docket No. MC–C–6748, Smoking by Passengers and Operating Personnel on Interstate Buses. Action on Smoking and Health, a nonprofit organization concerned with problems related to smoking, was an intervenor before the Commission.

5. 28 U.S.C. § 2325 requires an application to enjoin an order of the Interstate Commerce Commission to be heard and determined by a district court of three judges pursuant to 28 U.S.C. § 2284. Jurisdiction is vested in this Court under 28 U.S.C. § 1336(a).

6. Report of the Hearing Examiner, Interstate Commerce Commission Docket No. MC–C–6748, Smoking by Passengers and Operating Personnel on Interstate Buses (January 27, 1971) at 13–14.

7. *Id.* at 14.

in buses. Some people cannot tolerate tobacco smoke."[8]

The Commission then issued its own report in which it discussed, *inter alia*, whether the facts developed on the record warranted regulatory action such as the imposition of a ban or limitation on smoking in interstate passenger-carrying motor vehicles.[9] The Commission agreed with the examiner's conclusion that petitioner Nader failed to adequately demonstrate the deleterious effects of second-hand smoke on the health of bus passengers.[10] But the report went on to state:

"We do believe, however, that the evidence presented by petitioner, as well as the voluminous material present in this record in support of petitioner's position, overtly demonstrates that second-hand smoke is an extreme irritant to humans (particularly with respect to its effect upon eyes and breathing) within its range and that, therefore, smoking on passenger-carrying motor vehicles must be found to be a serious nuisance, capable of disrupting the orderly enjoyment of public transportation, and adversely affecting the adequacy and availability of the service provided by passenger carriers operating in interstate commerce. Furthermore, it can be logically concluded from this fact, as well as from the many representations submitted in this proceeding, that this nuisance has a substantial impact upon the riding habits of the general public. Many persons submitting representations in this proceeding stated that because of smoking they either (1) are unable to utilize interstate buses; (2) limit their use of such buses; or (3) utilize such buses where no other adequate choice is available despite their desire to avoid tobacco smoke." (citations omitted).[11]

Finding that the evidence showed that only about 20 per cent of the passengers on interstate buses smoke, and that separate seating sections, in combination with existing air circulating systems, would eliminate most of the discomfort due to second-hand smoke,[12] the Commission promulgated the regulation which is here at issue. That regulation provides:

"Provision for separate seating for smokers and nonsmokers on interstate passenger carriers by motor vehicle.

(a) All motor common carriers of passengers subject to part II of the Interstate Commerce Act, which desire to permit smoking of cigars, cigarettes, or pipes, shall, where smoking on passenger-carrying motor vehicles is otherwise permitted by law, provide a smoking section, consisting of a number of seats in the rear of the passenger-carrying motor vehicle, not to exceed 20 percent of the capacity of the said vehicle. Except as otherwise permitted under paragraph (b) of these rules, smoking of cigars, cigarettes, or pipes shall not be permitted in any portion of the motor vehicle other than the smoking section required by (1) above.

(b) The provisions of paragraph (a) shall not be construed to apply to charter operations performed by motor common carriers of passengers subject to part II of the Interstate Commerce Act.

(c) In the event of any unusual circumstances arising under paragraph (a), the operator (driver) of the motor vehicle involved (or other carrier employee) may exercise reasonable discretion to the extent permitted by the carrier, by making minor modifications in the special seating sections established by paragraph (a) in order to assure the comfort of all passen-

---

8. *Id.* at 15.

9. Smoking by Passengers and Operating Personnel on Interstate Buses, 114 M.C.C. 256 (Nov. 8, 1971).

10. *Id.* at 264–65.

11. *Id.*

12. *Id.* at 265–66.

gers and the provision of safe, adequate, and expeditious transportation service." [13]

## II. Applicability of § 212(a) of the Interstate Commerce Act

The principal issue which emerges from this litigation is whether the regulation in question imposes a change in outstanding certificates of public convenience and necessity in violation of § 212(a) of the Interstate Commerce Act. This section reads in pertinent part:

"212. Suspension, change, revocation, and transfer of certificates, permits and licenses. (a) Certificates, permits, and licenses shall be effective from the date specified therein, and shall remain in effect until suspended or terminated as herein provided. Any such certificate, permit, or license may, upon application of the holder thereof, in the discretion of the Commission, be amended or revoked, in whole or in part, or may upon complaint, or on the Commission's own initiative, after notice and hearing be suspended, changed or revoked, in whole or in part, for willful failure to comply with any provision of this part or with any lawful order, rule, or regulation of the Commission promulgated thereunder, or with any term, condition, or limitation of such certificate, permit or license." [14]

Plaintiff argues that the smoking regulation, requiring segregation of smokers and nonsmokers and the confinement of smokers to designated seats in the rear of the bus, where no such condition had been attached to previously issued certificates, effects a change in presently held certificates which can be accomplished only by the procedures and for the reasons set forth in § 212(a); that is, that the certificates can be changed only after notice and hearing and only for a willful violation by a carrier of a lawful restriction on its operation. Since the Commission makes no claim that the smoking regulation was issued in accordance with § 212(a), or that it is even applicable, plaintiff concludes that the regulation violates the requirements of § 212(a) and should be enjoined. The Commission urges that the regulation was a proper exercise of rulemaking authority and should be upheld because the rulemaking procedure by which it was promulgated obviated any necessity to comport with § 212(a) which might have existed if the commission had proceeded against carriers individually rather than as a group.

The threshold inquiry facing the Court is whether the smoking regulation does in fact "change" existing certificates within the meaning of § 212(a). Unfortunately the parties have focused the thrust of their argument on other matters. Yet unless it is demonstrated that there exists the necessary change of a certificate which triggers the applicability of § 212(a), we need not consider the further question of whether such a change would be proper if effected through a rulemaking proceeding. Since we find that the instant regulation imposes no change in the certificate of any motor carrier we do not reach the issue of whether the scope of permissible rulemaking is narrowed by § 212(a).[15]

---

13. *Id.* at 276 (Appendix C).

14. 49 U.S.C. § 312(a).

15. We note that we have found no case dealing with the precise issue of whether the Commission may change existing certificates in avoidance of the terms of § 212(a) by rulemaking proceedings. American Airlines, Inc. v. Civil Aeronautics Board, 123 U.S. App.D.C. 310, 359 F.2d 624 (1966) and Regular Common Carrier Conference v. United States, 307 F.Supp. 941 (D.D.C.1969), cited

by the government, do not address the argument raised here by the plaintiff that § 212(a) bars the change of an outstanding certificate except for willful failure to comply with any legal provisions.

American Airlines was an action under the Federal Aviation Act, in which the petitioning airlines urged the invalidity of a Civil Aeronautics Board regulation, issued pursuant to a rulemaking proceeding, which provided that the sale of space on flights at wholesale rates—"blocked space service"—could be provided only by all-cargo carriers.

The parameters of the applicability of § 212(a) to Commission action which affects a carrier's operations are clarified by examination of § 212 within the framework of the Interstate Commerce Act itself. Part II of the Act, which also has been referred to as the Motor Carrier Act, establishes a comprehensive scheme for the regulation of motor carriers. The Commission is vested with the regulation of the transportation of passengers by motor carriers engaged in interstate commerce in § 202(a).[16] Section 204(a)(1) and ·(6) [17] makes it the duty of the Commission to regulate motor carriers and administer the provisions of the Act, and to that end, grants it the power to establish rules and regulations to assure, among other things, the adequacy of service. Section 208(a) [18] requires each certificate to designate the bounds of the carrier's operating authority; specifically, the service to be rendered, and the routes, termin, intermediate points, and the territory in which the carrier may operate. It further provides for the imposition of restrictions on the designated operating authority:

"There shall, at the time of the issuance and from time to time thereafter, be attached to the exercise of the privileges granted by the certificate such reasonable terms, conditions, and limitations as the public convenience and necessity may from time to time require, including terms, conditions, and limitations as to the extension of the route or routes of the carrier, and such terms and conditions as are necessary to carry out, with respect to the operations of the carrier, the requirements established by the Commission under section 204(a)(1) and (6)."

■ These provisions plainly authorize the Commission to affix conditions to outstanding certificates "from time to time" in order to assure the adequacy of motor bus service, and enable the conditions to be affixed by means of general rulemaking. This is precisely what the Commission has done in this instance. Having determined the segregation of smokers and nonsmokers to be a necessary step to assure adequate and available bus service, the Commission so conditioned the carrier's certificates by promulgating the regulation at issue.

■ Despite the statutory authorization, plaintiff contends that the Commission's power to attach conditions to duly

The petitioners contended that they should have been accorded an adjudicatory hearing, assured to them by § 401(g) of the Federal Aviation Act, 49 U.S.C. § 1371(g), because the Board action amounted to a modification or suspension of existing rights under their certificates. Although the case upheld the right of the Board to issue a rule of general applicability notwithstanding the statutory hearing requirement, it does not control the question raised here because of the statutory differences between § 401(g) of the Federal Aviation Act and § 212(a) of the Interstate Commerce Act. Although they are generally similar, § 401(g) specifies that the Board may modify or suspend a certificate if the public convenience and necessity so require. There is no requirement that the modification or suspension be made for an intentional failure to comply with any legal provision; that requirement is reserved only for revocation of certificates. Section 212(a), however, authorizes change, suspension or revocation of a certificate only for a willful failure to comply with a lawful provision. Thus the restriction in § 212(a) requiring a showing of a willful violation is not contained in § 401(g) and could not have been considered in the court's ruling in American Airlines.

In Regular Common Carrier Conference, the issue was whether the Interstate Commerce Commission had proceeded properly in removing cargo load restrictions from outstanding certificates by means of rulemaking rather than adjudication. The validity of the Commission action under § 212(a) was not before the court.

Because the question of the Commission's rulemaking power to change certificates under § 212(a) is one of first impression, it must be deferred until the Court is presented with a factual situation in which, unlike the circumstances here, there has actually been a change of a certificate.

16. 49 U.S.C. § 302(a).

17. 49 U.S.C. § 304(a)(1) and (6).

18. 49 U.S.C. § 308(a).

issued certificates is limited nevertheless by the restrictions found in § 212(a). That provision bestows a degree of security on carriers against summary changes in certificated operating authority through the mechanism of notice and hearing and by the limitation that willful failure to comply with the Act or lawful orders or regulations of the Commission must be demonstrated.[19] However, this section, by its very terms, is applicable only to suspension, change and revocation of certificates and not to every restriction which could conceivably affect a carrier's operation. While we may agree that some restrictions may so substantially impair the operating authority specified in a certificate that they must be considered to have "changed" the certificate, we reject what appears to be the import of plaintiff's argument that every term, condition, or limitation imposed under § 208(a) falls within the purview of § 212(a)'s restrictions on change. Certainly each condition attached to a certificate will affect the carrier's authorized operations to some degree, for that is its purpose. However, Congress, in the Motor Carrier Act and in the National Transportation Policy,[20] gave the Commission the authority and the duty to engage in ongoing regulation in the face of the nation's changing transportation needs, to maintain and promote continuous, safe, adequate, economical, and efficient service. If every term, condition, or limitation deemed necessary by the Commission to effect these purposes were considered a change of a certificate, the statutory scheme would be frustrated, for the Commission virtually would be precluded from regulating except when it initially issued a certificate and in the relatively rare instance when a carrier willfully disobeyed one of the original terms. As the Supreme Court commented concerning the need for the Commission to make future restrictions or modifications to adjust the interplay of public interests as contemplated by the National Transportation Policy, "Congress could not have expected the Commission to be able to determine once and for all the provisions essential to maintain the required balance."[21] For this reason Congress gave the Commission the authority in § 208(a) to meet changing transportation needs by imposing conditions and limitations on a carrier's operations "from time to time," and omitted from that section the formal requirements of notice and hearing, and of demonstrating a willful failure to comply, contained in § 212(a). The scope of § 212(a)'s applicability was limited to instances of changes of the "privileges granted by a certificate," which are specifically enumerated in the certificate in accordance with § 208(a). Under this statutory scheme the Commission may attach new conditions re-

19. United States v. Rock Island Motor Transit Co., 340 U.S. 419, 426, 435, 71 S.Ct. 382, 95 L.Ed. 391 (1951).

20. 49 U.S.C. preceding § 301, *formerly* § 202(a) of the Motor Carrier Act of 1935, 49 Stat. 543:

It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act [chapters 1, 8, 12, 13 and 19 of this title], so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several states and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating and preserving a national *transportation system by water, highway,* and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.

21. Rock Island Motor Transit Co., *supra* note 19, 340 U.S. at 435, 71 S.Ct. at 391.

strictive of a carrier's authorized operations in order to implement any legitimate statutory goal, and will not fall within the proscriptions of § 212(a) unless the conditions substantially modify the carrier's enumerated operating privileges.

This distinction between restrictions which amount to a change or revocation of a certificate and those which do not was recognized in United States v. Rock Island Motor Transit Co., 340 U.S. 419, 71 S.Ct. 382 (1951). That case concerned the power of the Interstate Commerce Commission to tighten the restrictions on operations of a railroad's motor carrier. affiliate. The Commission, having issued Rock Island a certificate for the operation of a particular route, subsequently promulgated an order modifying that certificate by restricting Rock Island's operation to motor service auxiliary to train service of Rock Island's railroad parent corporation. The original certificate contained the condition that the Commission might impose additional terms to restrict Rock Island's operation to service which is auxiliary to rail service. Rock Island objected that the Commission changed or revoked part of its existing operating authority in violation of § 212 because there was no willful failure by Rock Island to comply with any lawful provision. The Commission claimed that there had been no change or revocation of Rock Island's authorization, but the modification was made in accordance with the reservation in the certificate. The Court held that the Commission had the power to enforce the reservation in order to carry out the policies of the Interstate Commerce Act and National Transportation Policy favoring coordinated rail and motor carrier service.[22] It was noted that the Commission did not have the unfettered authority to change certificates at will, for that would violate § 212. Changes in operating or service could only be made to insure that the motor operations would continue as auxiliary

to train service. The Court then considered whether the modifications which were imposed were in fact auxiliary. Noting that the Commission had at times permitted far less restrictive "auxiliary" service than that which it had now prescribed for Rock Island, the Court said:

> "Those divergences, however, are an exercise of the discretionary and supervisory power with which Congress had endowed the Commission. It is because Congress could not deal with the multitudinous and variable situations that arise that the Commission was given authority to adjust services within the limits of the Motor Carrier Act, § 208." 340 U.S. at 442, 71 S.Ct. at 395.

Answering Rock Island's argument that the new conditions marked a change in Commission policy and consequent change in the certificate, which practice was condemned in United States v. Seatrain Lines, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1951) (discussed at page 10 *infra*), the Court distinguished *Seatrain* as an instance where the restriction of the cargo authorized to be carried by Seatrain's certificate was a clear change of the certificate. Rock Island's certificate, on the other hand,

> "required service auxiliary and supplemental to rails, and the modification was not a change of policy as to that but an additional requirement to insure coordinated service. The new conditions . . . are of a character that aids rail operation and minimizes competition with over-the-road motor carriers. Such added conditions are not changes in or revocations of a certificate in whole or in part but a carrying out of the reservation in the certificate." 340 U.S. at 443, 71 S.Ct. at 395.

Of course, since the basis for the Commission's power to modify the carrier's certificated operation in *Rock Island* was the reservation of such a condition in the certificate, that case is distin-

---

22. *Id.* 340 U.S. at 435–436, 71 S.Ct. 382.

guishable from the present situation in the sense that no reservation is relied on by the Commission as authority for the issuance of the smoking regulation. The importance of *Rock Island* is the recognition by the Court that the Commission possessed authority to adjust motor carrier service under § 208(a) in order to carry out its statutory mandate, and that such an adjustment could be accomplished without effecting a change of a certificate.[23]

■ The cases upon which plaintiff principally relies, Watson Brothers Transportation Co. v. United States, 132 F.Supp. 905 (N.D.Neb.1955), aff'd, 350 U.S. 927, 76 S.Ct. 302, 100 L.Ed. 810 (1956), American Trucking Association v. Frisco Transportation Co., 358 U.S. 133, 79 S.Ct. 170, 3 L.Ed.2d 172 (1958), United States v. Seatrain Lines, 329 U.S. 424, 67 S.Ct. 435 (1947), and CAB v. Delta Airlines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961), manifest a regard for the security against summary changes of operating authority which § 212(a) and similar statutory provisions were intended to insure carriers. Nevertheless the cases are not inconsistent with the premise that the protections embodied in § 212(a) are effective only with respect to substantial restriction of fundamental operating privileges and not with respect to the imposition of every condition or limitation which the Commission has the authority to impose. Most directly in point is Watson Brothers Transportation Co. v. United States, *supra.* That case involved an order of the Commission promulgated under the Motor Carrier Act which purported to change the authority in Watson Brothers' certificate to transport "general commodities" to the more restricted authority to transport certain types of explosives. Despite the Commission's claim that it merely had attempted to correct a clerical error in the original certificate, the court held that the order

pronounced a change and revocation of a duly issued certificate, and that as such it was invalid for failure to comply with § 212(a).[24] The point to be noted is that there was no dispute that the restriction of cargo which the Commission had attempted was a significant change of the operating authority which Watson Brothers had been granted in its original certificate. In United States v. Seatrain Lines, *supra,* an action involving the water carrier provisions of the Interstate Commerce Act, the Commission also had issued a certificate to Seatrain to carry "commodities generally" by water between certain ports, and subsequently issued a new order which in effect deprived Seatrain of the right to carry goods generally by restricting the cargo it could carry. The Court found that the Commission's action appeared to be an effort to revoke or modify substantially Seatrain's original certificate in order to make it conform to a subsequent policy ruling, and held that the Commission had no authority under the Act to alter Seatrain's certificate.[25] Here again it was explicit that the attempted change of the carrier's authority to carry commodities generally was a substantial modification of its certificate. Similarly, in CAB v. Delta Airlines, *supra,* Delta challenged an order of the Board barring certain flights which Delta had been operating under an existing certificate. The issue was whether, under a provision of the Federal Aviation Act substantively similar to § 212(a) of the Motor Carrier Act, the Board could alter a certificate without notice and hearing. The Court held it could not. In this case too it was clear that the cancellation of Delta's certificated operation was a change or revocation of its certificate. Moreover in both *Seatrain* and *Delta* the Court noted statutory distinctions between the Motor Carrier Act and the legislation there at issue which tended to demonstrate that Congress intended to grant greater flex-

---

23. *Cf.* Dan-Air Services, Ltd. v. CAB, 475 F.2d 408, 412–413 (D.C.Cir. 1973).

24. 134 F.Supp. at 909.

25. 329 U.S. at 432–433, 67 S.Ct. 435.

ibility in attaching terms, conditions and limitations to motor carrier operations than those of other types of carriers.[26] Thus these cases merely support the acknowledged principle that Commission action which substantially modifies certificated operating authority must conform to the requirements of § 212(a). Nowhere are they inconsistent with the view that the imposition of conditions which affect a carrier's operations, but do not substantially change its operating authority, does not come within the purview of § 212(a).[27]

We turn now to the question of whether plaintiff has demonstrated that the instant smoking regulation, requiring the segregation of smokers and non-smokers and limiting the number of seats for smokers, is a substantial restriction of the operating authority of any carrier. We think that plainly it is not. The regulation changes neither the service authorized to be performed by any carrier, nor any routes, service points, or territory of operation. Plaintiff's premise that the "limitation of the number of smoker-passengers who may be served is a limitation on the service the carrier is authorized to provide" misconceives the boundaries of authorized service. By issuing certificates of public convenience and necessity the Commission has authorized motor bus carriers merely to transport passengers over specified routes. The power to fix the details of operations, such as the quality of service, must reside ultimately not with the carriers, but with the Commission, which has been given the duty and authority to insure that service is carried out consistently with the policies of the Interstate Commerce Act. The smoking regulation does not restrict the right of any carrier to transport passengers over particular routes, but affects one of the details of service, the seating and conduct of passengers, for which the Commission has determined the regulation is necessary to insure adequate service. Moreover, the regulation is not a limitation on the number of smoker-passengers who may be served, for smoker-passengers are not refused service but simply asked to sit in a specified area or to refrain from smoking if the smoking section is filled. We find no support for the contention that the regulation will in effect discourage smoker-passengers from utilizing buses, and thereby limit authorized service. In fact the Commission found that many persons curtail their use of buses because of the effects of second-hand smoke which presently exist. Conversely, no finding was made that the regulation would dissuade habitual smokers from riding buses; the institution of the 20 per cent rule rather than a complete prohibition of smoking, and the flexibility in seating provided by part (c) of the regulation, were attempts to accommodate these persons. Presumably, if the regulation has any effect it will be to increase rather than decrease the availability of interstate bus transportation to the general public. We conclude therefore that the

26. In Delta the Court pointed out a distinguishing feature of the Rock Island case which permitted the Commission in that instance to modify a motor carrier's certificate: "the Motor Carrier Act makes express provision for summary modifications after certification, 49 U.S.C. § 308." 367 U.S. at 333, 81 S.Ct. at 1623. The Federal Aviation Act permits the attachment of terms, conditions and limitations to the exercise of privileges granted by a certificate, but has no provision for such attachment "from time to time." 49 U.S.C. § 1371(e)(1).

In Seatrain the Court noted that § 208 of the Motor Carrier Act, which prescribes the attachment of terms, conditions and limitations to certificates, authorizes the Commission to "specify the service to be rendered" by a carrier, but that § 309 of the water carrier provisions of the Act, 49 U.S.C. § 909, which empowers the Commission to grant certificates to water carriers, does not authorize the Commission to specify the service to be rendered. 329 U.S. at 431, 67 S. Ct. at 438.

27. American Trucking Association v. Frisco Transportation Co., p. 10 *supra*, upholding the power of the Commission to correct inadvertent ministerial errors in certificates, is not generally relevant to this discussion except insofar as it confirms, in dicta, the holdings of Seatrain and Watson Brothers.

Commission's smoking regulation will not restrict the passenger service which motor carriers have been authorized to perform and does not constitute a change of a certificate within the meaning of § 212(a).

## III. Jurisdiction of the Commission

Plaintiff attacks the jurisdiction of the Commission to issue smoking regulations for motor carriers, reasoning that the regulation was grounded on the alleged power to provide for the "comfort, safety and health of passengers," and that any jurisdiction which the Commission enjoyed over these matters has been transferred to the Department of Transportation pursuant to the Department of Transportation Act, 49 U.S.C. § 1651 et seq. We find that the Commission premised the regulation on its authority to provide for adequate service and for the public convenience and necessity, and that as an aspect of these powers the Commission may affect carrier's operations touching the comfort, safety and health of passengers.

Reviewing its authority to issue the instant regulation under the provisions of the Interstate Commerce Act, the Commission concluded:

"[S]hould we find that freely permitting smoking on interstate passenger-carrying motor vehicles by passengers or operating personnel materially and adversely affects the continuous and adequate service required to be provided the general public by motor common carriers of passengers in interstate commerce or is required by the public convenience and necessity, we possess the power to promulgate

reasonable regulations aimed at rectifying the situation."[28]

That the Commission may regulate in furtherance of these interests is beyond dispute. The opinion of the Commission demonstrates that the smoking regulation was issued to advance such interests. The Commission thought the regulation to be necessary in order to provide for a totally adequate interstate passenger service, free from irritants and nuisances which adversely affect the riding public.[29] It found that the evidence of the record demonstrated that second-hand smoke is an extreme irritant to humans; that smoking on buses is a serious nuisance capable of disrupting the orderly enjoyment of public transportation, and adversely affecting the adequacy and availability of service; and that it had a substantial impact on the riding habits of the public, dissuading many persons from utilizing interstate bus transportation.[30] Any concern which these findings reflect for the comfort, safety and health of passengers appears to be rationally related to the Commission's acknowledged power to provide for the public convenience and necessity and to maintain the adequacy of service. Moreover, the Commission has exercised authority over the comfort, health and safety of the public since its earliest motor carrier cases,[31] and its jurisdiction over these areas finds additional support in the duty imposed by the National Transportation Policy to administer the Act to promote "safe, adequate, economical and efficient service," [32] and in its authority to enforce the duty imposed on motor carriers by § 216 of the Act[33] to provide "safe and adequate" service.[34] In sum,

---

28. Smoking by Passengers and Operating Personnel on Interstate Buses, *supra* note 9, 114 M.C.C. at 264.

29. *Id.*

30. *Id.* at 265.

31. *See* Meisinger Stages Common Carrier Application, 1 M.C.C. 471, 473 (1937).

32. Gateway Transportation Co. v. United States, 173 F.Supp. 822, 827 (W.D.Wisc. 1959) ; *see* United States v. Rock Island Mo-

tor Transit Co., *supra* note 19, 340 U.S. at 435–436, 71 S.Ct. 382, 95 L.Ed. 391 ; Mc-Lean Trucking Co. v. United States, 321 U. S. 67, 80–88, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

33. 49 U.S.C. § 316.

34. Discrimination in Operations of Interstate Motor Carriers of Passengers, 86 M.C.C. 743, 752 (1961), aff'd sub nom., State of Georgia v. United States, 201 F.Supp. 813

we find that the issuance of the smoking regulation was a proper exercise of the jurisdiction of the Commission.

■ On the question of the transfer of jurisdiction over matters of comfort, safety and health of passengers to the Department of Transportation, the language of § 6 of the Department of Transportation Act, 49 U.S.C. § 1655(e)(6)(C), specified that certain of the powers of the Commission under § 204(a)(1) of the Interstate Commerce Act were transferred to the Department of Transportation "to the extent that they relate to . . . safety of operation and equipment." [35] Plainly this transfer of jurisdiction was limited in scope to matters of safety of operation and equipment and should not be construed to divest the Commission of its legitimate concern with the comfort, safety, and health of passengers.[36] The distinction between jurisdiction over matters affecting passenger comfort and safety and matters concerning safety of operation was confirmed by the Department of Transportation in an order denying Ralph Nader relief substantially similar to that which he sought from the Commission.[37] The Department declined to issue a rule prohibiting smoking on interstate buses because there was insufficient evidence presented relating smoking to safety of operation and equipment, the only area over which it had jurisdiction:

"Generally, those who favored the proposed rule complained about the health hazard and inconvenience to those who are nonsmokers. The petitioner failed to establish a relationship between smoking on buses and safety of operation. There was no evidence indicating actual accident involvement owing to smoking on buses. The evidence relating to the potential for accidents caused by smoking tended to be highly speculative and conjectural.

. . . . . .

The jurisdiction of the Bureau of Motor Carriers Safety to regulate interstate bus transportation is limited to matters relating to safety of operation and equipment. Passenger rates, passenger comfort, and the long-range health of bus occupants are not included within the scope of the Bureau's jurisdiction over safety of operation and equipment.

Therefore, evaluation of the comments, views and arguments, consideration of the data, past regulatory experience, and the matters discussed herein warrant denial of the petition.

Accordingly, Ralph Nader's petition for rulemaking is denied."[38]

■ The smoking regulation issued by the Commission has no relation to safety of operation and equipment in interstate bus transportation. It is an exercise of the Commission's power to regulate in the interests of adequate service and the public convenience and necessity, and insofar as it affects such rational incidents of that power as passenger comfort, safety and health, it is also

---

(M.D.Ga.1961), aff'd per curiam, 371 U.S. 9, 83 S.Ct. 21, 9 L.Ed.2d 47 (1962).

35. 49 U.S.C. § 1655(e):
There are hereby transferred to and vested in the Secretary all functions, powers, and duties of the Interstate Commerce Commission . . . under—

. . . . . .

(6) the following provisions of the Interstate Commerce Act, as amended—

. . . . . .

(C) relating generally to qualifications and maximum hours of service and of employees and safety of operation and equipment: Sections 204(a)(1) and (2), to the extent that they relate to qualifications and maximum

hours of service of employees and safety of operation and equipment . . . .

36. *See* 49 U.S.C. 1655(f)(1) which provides: Nothing in subsection (2) shall diminish the functions, powers, and duties of the Interstate Commerce Commission under sections 1(6), 206, 207, 209, 210a, and 216 of the Interstate Commerce Act, as amended, or under any other section of that Act not specifically referred to in subsection (3).

37. Order of November 3, 1970, Federal Highway Administration Docket No. MC–19, Smoking on Buses, published at 35 Fed.Reg. 17427.

38. *Id.*

within the sphere of the Commission's legitimate jurisdiction.

## IV. Evidentiary Challenges

The regulation in question was adopted as a result of a rulemaking proceeding. We do not understand plaintiff to challenge the rulemaking form of the proceedings *per se*, but rather to contend that despite the form of the procedure used the Commission was without power under § 212(a) of the Act to change certificates previously issued by promulgating the instant regulation.[39] Presumably because of its position that the smoking regulation could only be issued in conformity with the requirements of § 212(a) and that this provision invokes the standard of review appropriate to adjudication, plaintiff argues that the regulation is invalid because it was based on inadequate findings and the findings were not supported by substantial evidence.

We have already rejected the argument that § 212(a) is applicable in this case. There is no other reason which suggests that this case was required to be determined on the record after opportunity for an agency hearing or that the standard of review for rulemaking would not be appropriate. Thus that is the standard we will employ.

The scope of judicial review of regulations of the Interstate Commerce Commission is well established:

"We do not weigh the evidence introduced before the Commission; we do not inquire into the wisdom of the regulations which the Commission promulgates, and we inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported." United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

█ Applying this standard, we conclude that the regulation finds a rational basis in the record. The Commission and the hearing examiner both found the evidence to demonstrate that many bus riders suffer physical irritation caused by second-hand smoke.[40] In view of the entire evidence of record we simply cannot say that it is unreasonable to conclude that adequate interstate bus service, in terms of the physical comfort and availability of service to passengers, requires the segregation and limitation of the number of smoker-passengers. The placement of the actual limit on the size of the smoking section at 20 per cent of the capacity of the vehicle represents the reasoned judgment by the Commission, after review of the evidence relating to the utilization of interstate buses by smokers, that this figure is best designed to accommodate the needs of the smoking and nonsmoking passengers. We are not prepared to disagree with this discretionary determination. The regulation is founded on conclusions which are rationally supported by the record and is a reasonable exercise of the Commission's rulemaking authority.[41]

39. Plaintiff, in its reply brief, has also attempted belatedly to interject the previously unraised contention that §§ 208 and 216 of the Act, upon which the Commission relied in promulgating the regulation, contain implied adjudicatory requirements of notice and hearing, and invoke an adjudicatory standard of review. Reply Brief of Plaintiff at 6–9. Not only has this argument been presented in an untimely fashion, but it is inconsistent with plaintiff's admission that the Commission could consider the matter of certificate changes in an *en masse* proceeding rather than in separate proceedings against individual certificate holders. Reply Brief of Plaintiff at 3–4. Nevertheless, considering

the merits of this position, we find that there is no authority which supports the construction that §§ 208 and 216 contain implied adjudicatory requirements.

40. *See* notes 7 and 11 *supra* and the accompanying text.

41. Plaintiff has raised two other arguments which require brief consideration. First, plaintiff claims that the decision of the Commission is arbitrary because a less stringent smoking rule has been proposed for rail passenger carriers than exists for motor carriers. We observe that the differences between the rail and motor carriage modes of transportation could conceivably support

## V. Conclusion

The arguments forwarded by plaintiff in support of enjoining the regulation have been found to be without merit. Accordingly, plaintiff is entitled to no relief and judgment will be entered for the defendants.

It is this 31 day of January, 1974,

Ordered that judgment be entered in favor of the defendants.

differing treatment with respect to passenger smoking, but that since no final regulation for rail carriers appears in this record, the suggested comparison can not be made. Secondly, plaintiff's contention that the regulation is impractical and would be harmful to the public raises matters which were properly considered by the Commission, in its discretion, and will not be disturbed by the Court unless there is no rational basis in the record for the Commission's conclusion. We find that there is evidence in the record respecting the enforceability of the regulation from which the Commission could reasonably make the judgment that enforcement will not present a serious problem.